1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10   RICARDO CAPELLO,

11                          Plaintiff,

12          v.

13   LESLIE SZIEBERT, et al.,

14                          Defendant.

15

CASE NO. C13-5275 BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR:
MAY 30, 2014

16          This 42 U.S.C. §1983 civil rights matter has been referred to the undersigned Magistrate

17   Judge pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) and Local Magistrate Judge Rules MJR 1,

18   MJR 3, and MJR 4.  The Court has previously ruled that it will not strike defendants' motion for

19   summary judgment and that the Court will not consider the portions of plaintiff's response that

20   are over-length (Dkt. 102, pp. 2-3).

21          The majority of defendants -- including defendants Sziebert, Richards, Cunningham,

22   Griffith, Temposky, and Bailey -- ask that the Court grant them summary judgment (Dkt. 75).

23   The Court recommends granting defendants' motion in part, but denying defendants' motion as

24   to Food Service Manager Temposky.  Plaintiff presents sufficient evidence to show that there is

1  an issue of fact regarding the alleged low sodium diet that plaintiff was provided from April 10,

2  2010 to the present.  The other defendants are entitled to summary judgment because plaintiff

3  fails to present admissible evidence that shows any other defendant was deliberately indifferent

4  to his medical needs.

5                                                    FACTS

6           Plaintiff is a resident of the Washington State Special Commitment Center located on

7  McNeil Island.  Plaintiff alleges that the medical care and special diet he received were

8  constitutionally inadequate.  Plaintiff received medical care for three medical conditions:

9  Hepatitis C, enlarged prostate, and Meniere's disease (Dkt. 5).  Plaintiff was prescribed a low

10  sodium diet for his Meniere's disease (Dkt. 5, p. 14, ¶ 6.9).  Plaintiff also alleges that he had a

11  right to have defendants purchase a hearing aid for him because of hearing loss associated with

12  Meniere's.

13          Meniere's disease is an ear condition where the inner ear retains salt.  The condition

14  results in dizziness or vertigo, which may cause vomiting, ringing in the ears, and loss of hearing

15  (Dkt. 76, Exhibit V).  The vast majority of patients respond to level one treatment for Meniere's

16  disease, which involves limiting sodium intake to below 2000 mg per day (Dkt. 76, Exhibit X,

17  deposition of Dr. Souliere).  There are three levels of treatment (*id*.).  Plaintiff has been given all

18  three levels of treatment and his condition is at the end stage of the disease in his right ear.

19  Plaintiff is now deaf in his right ear and a hearing aid will not help him hear (*id*.).

20          Defendants set forth a condensed version of facts concerning plaintiff's treatment for

21  each condition (Dkt. 75 pp. 3-13).  Defendants support their version of facts with specific

22  medical records and affidavits of medical providers (*id*.).  In plaintiff's response, plaintiff does

23  not contradict the factual assertions or medical records that defendants present (Dkt. 87).  Instead

24

plaintiff makes conclusory statements about a lack of treatment and then cites to lists of

voluminous exhibits without explanation.  Dkt. 87 pp. 11- 14.  With regard to his claim that he

did not receive a low sodium diet, plaintiff presents evidence showing that there is a genuine

issue of fact regarding the low sodium diet at the facility (Dkt. 87, p. 11).  The exhibits plaintiff

cites on this issue include affidavits from other residents who work in the kitchen.  These

residents set forth certain recipes for items they make (Dkt. 87 Exhibits 6 and 7).  The food

labels plaintiff attaches as exhibits show that the sodium content listed by the manufacturer and

the sodium content listed on the menu by the facility do not match.  Plaintiff shows that the

amount of sodium in the recipe is understated on the menu.  *See* Plaintiff's Exhibits 253,

(menus), 254 (chart outlining alleged sodium discrepancies), 256-279 (manufacturer's labels).

On this issue, plaintiff has presented admissible evidence to support his claim. Except for the diet

issue, however, plaintiff has not provided the Court with specific references to dispute

defendants' statement of the facts regarding plaintiff's treatment.  Therefore, the Court adopts

the portions of defendants' statements of fact regarding plaintiff's treatment.  Defendants state:

> Brief history of Mr. Capello's medical conditions and requests to SCC.

1.      Hepatitis C.

> The SCC first knew about Mr. Capello's Hepatitis C diagnosis in 2001, but Mr. Capello allegedly was unaware of the diagnosis until 2002. From 2001 forward, SCC medical staff made sure Mr. Capello periodically underwent tests to monitor the status of his Hepatitis C. (*Decl. of Knoll*, ¶11, 12). The tests included blood screens and liver biopsies. These tests consistently showed that treatment was not medically necessary at the time. (*Decl. of Sziebert*,¶8).
> In June of 2012, after Mr. Capello had been given an interval history and physical by Dr.(sic)[1] Howard Welsh, ARNP (Pro Se Defendant), Mr. Capello was referred to a Gastroenterologist for the purpose of having his Hepatitis C evaluated. According to Dr.(sic) Welsh, the referral was made because he felt Mr.

---

[1] Defendants inaccurately refer to Advanced Registered Nurse Practitioners Welsh, Griffith, and Dixon as doctors in their briefing (Dkt. 75).

REPORT AND RECOMMENDATION - 3

Capello's Hepatitis C viral load was too high. (*Decl. of Knoll*, ¶13, 14) [footnote omitted]. On October 4, 2012, Mr. Capello had his first visit and consultation with Dr. Brian Mulhall, a Gastroenterologist, for the purpose of evaluating whether he was an appropriate candidate to receive Hepatitis C treatment. Dr. Mulhall noted that Mr. Capello's only complaint was that he had "occasional lightheadedness and headaches attributed to his Meniere's disease." Dr. Mulhall did not note any abnormalities significant to Hepatitis C or that Mr. Capello was suffering from symptoms that normally relate to liver dysfunction. At the conclusion of this initial visit, Dr. Mulhall ordered labs and a liver biopsy and reserved judgment as to future Hepatitis C treatment until the results of the labs and biopsy were received. (*Decl. of Knoll*, ¶16-19).

On or about November, 2012, Dr. Mulhall received the results of Mr. Capello's liver biopsy that he had ordered the previous month. On November 16, 2012, Dr. Mulhall informed Mr. Capello that his liver biopsy report "showed moderate-to-severe inflammation and moderate fibrosis . . ." and further recommended that "we continue with the plan defined at your last visit and plan to return to see me in the next few weeks." (*Decl. of Knoll*, ¶20).

The next visit with Dr. Mulhall occurred on December 11, 2012. Again like before, Mr. Capello only made complaints about his Meniere's disease and not symptoms specific to Hepatitis C. (*Decl. of Knoll*, ¶21). Dr. Mulhall "talked in-depth [to Mr. Capello] about the nature of treatment, the potential side effects, the duration of therapy and the likelihood of cure." According to Dr. Mulhall, Mr. Capello "seemed to have reasonable understanding" about the nature of future Hepatitis C treatment. At the conclusion of this visit, Dr. Mulhall recommended Hepatitis C treatment pending the results of three necessary medical clearances: Cardiology, Ophthalmology, and Psychiatry. (*Decl. of Knoll*, ¶22).

By September 2013, Mr. Capello had finally obtained all his medical clearances and triple therapy Hepatitis C treatment began. (*Decl. of Sziebert*, ¶12). Within weeks after starting treatment, Mr. Capello's Hepatitis C virus dramatically improved. For instance, his Hepatitis C viral load is now nearly undetectable. (*Decl. of Knoll*, ¶23) and (*Decl. of Sziebert*, ¶13).

2.     Meniere's Disease (footnote omitted).

On or about July 2005, Mr. Capello went to see Dr. (sic) Randall Griffith (State Defendant) because he was experiencing hearing loss in his right ear and bouts of dizziness. On July 26, 2005, Dr.(sic) Griffith referred Mr. Capello to an Ear, Nose, and Throat (ENT) specialist so that his symptoms/problems could be evaluated more fully. (*Decl. of Griffith* ¶7) and (*Decl. of Knoll*, ¶27). Dr. Charles R. Souliere (ENT specialist) eventually saw Mr. Capello on August 30, 2005 (1st visit) and diagnosed him with right-sided Meniere's disease. The course of treatment recommended at that time was a combination of a "low-sodium diet (less than 2000 mg/day) and diuretics in the form of Dyazide . . . ." If this did not improve his condition, then a "right middle ear steroid injection" could be entertained. (*Decl. of Knoll*, ¶28). Dr. Souliere next saw Mr. Capello on November 8, 2005 (2nd visit). During this visit, Dr. Souliere increased the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

diuretic based upon Mr. Capello's insistence that he was having trouble with his sodium levels. (*Decl. of Knoll*, ¶29). Dr. Souliere saw Mr. Capello next on January 24, 2006 (3rd visit). At that visit, Mr. Capello still complained of dizziness and increased loss of hearing in his right ear. Because of no improvement in Mr. Capello's condition, Dr. Souliere decided to recommend a middle ear steroid injection. This was performed on March 7, 2006 (4th visit) in Dr. Souliere's office. (*Decl. of Knoll*, ¶30). On April 11, 2006 (5th visit), Mr. Capello had a follow up visit and reported that his vertigo and tinnitus had improved, but not his hearing and he had been off diuretics for one month. (*Decl. of Knoll*, ¶31). On October 31, 2006 (6th visit), Mr. Capello indicated he had no significant dizziness and was feeling "okay with occasional tinnitus . . . ." (*Decl. of Knoll*, ¶32). The treatment recommendations made at this visit included staying on diuretic and possibly repeating the middle ear steroid injection. (*Decl. of Knoll*, ¶33). On February 12, 2007 (7th visit), Mr. Capello had another visit with Dr. Souliere. The notes indicated Mr. Capello's hearing had improved, the Meniere's disease was stable, and the diuretic should continue. (*Decl. of Knoll*, ¶34). On August 28, 2007 (8th visit), Mr. Capello had a six month follow up. Dr. Souliere noted that the Meniere's disease was stable and that the diuretic should continue and to return in six months. (*Decl. of Knoll*, ¶35). On April 21, 2008 (9th visit), Mr. Capello appeared for another six month follow up. Like before, Dr. Souliere determined that the Meniere's disease was stable and that the diuretic should continue. He recommended a follow up in one year. (*Decl. of Knoll*, ¶36). On March 2, 2011, Mr. Capello was seen by Dr. Ronald Benveniste, an otolaryngologist, who recommended Mr. Capello go back to see Dr. Souliere. (*Decl. of Knoll*, ¶37). On July 18, 2011 (10th visit), Mr. Capello saw Dr. Souliere and it was noted that he had lost additional hearing and was still taking a diuretic. Since there was additional hearing loss, Dr. Souliere recommended Mr. Capello undergo an MRI of his head to rule out the possibility of a tumor causing hearing loss. This was performed on August 22, 2011, and "showed no evidence of intracranial mass or tumor." At this point, Dr. Souliere recommended injecting the right ear with gentamicin "transtympanically in an effort to do what is called a chemical labyrinthectomy in that ear." This treatment was aimed at getting rid of the dizziness spells and vertigo attacks. The gentamicin injections were first given on September 15, 2011 (11th visit). (*Decl. of Knoll*, ¶38). On December 1, 2011 (12th visit), Mr. Capello had a second gentamicin injection. (*Decl. of Knoll*, ¶39). On August 29, 2013 (13th visit), Mr. Capello saw Dr. Souliere for complaints of decreased hearing in his right ear as usual but now he was experiencing predominantly position-related spinning, which was different than some of his earlier attacks. Dr. Souliere diagnosed Mr. Capello with benign positional vertigo and recommended canalith repositioning therapy that could be done by a physical therapist. (*Decl. of Knoll*, ¶40). Since August 29, 2013, Mr. Capello has not been back to see Dr. Souliere. However, Ms. Galina Dixon has referred Mr. Capello to see a physician assistant named Midge Price to treat his benign positional vertigo. (*Decl. of Knoll*, ¶41). The canalith repositioning was performed on December 13, 2013 with instructions to return in one week if dizziness persists. (*Decl. of Knoll*,

¶41). As of the filing of this brief, the undersigned is not in possession of any medical records that state Mr. Capello has experienced episodes of dizziness since the canalith repositioning treatment.

The last communication by Dr. Souliere to Mr. Capello came by letter on September 10, 2013. In this letter addressed to Dr. Dixon, Dr. Souliere informed her in relevant part that Mr. Capello has "end-stage Mnire's (sic) disease in his right ear with near total deafness." He further went on to state that it was his impression that his *right ear is not aidable* with hearing aid technology to any significant benefit and given that his left ear is normal the only advantage that hearing from his right ear would offer would be directionality of sound, and would not increase the loudness or overall ability to hear in quite (sic) situations." (*Decl. of Knoll*, ¶42).

3.      Enlarged Prostate.

On July 22, 2012, Mr. Capello made a sick call request to see his primary care physician because of prostate problems (excessive urination). He saw Dr. (sic) Welsh on July 26, 2012 about this problem and Dr. (sic)Welsh performed a routine digital exam on him. The medical record indicated that Mr. Capello's prostate was of normal contour and without nodules, but slightly enlarged. Also Mr. Capello's PSA was normal. Dr. (sic) Welsh recommended that maybe a followed up with a GI specialist would be advisable. (*Decl. of Knoll*, ¶43). On September 23, 2012, Mr. Capello wrote Dr. (sic)Welsh a letter stating among other things that no medical appointment had been made to address the enlarged prostate. (*Decl. of Knoll*, ¶44). No records exist to support a conclusion that Dr. (sic) Welsh referred Mr. Capello to a specialist for the purpose of examining his enlarged prostate.6

FN6
It appears that Dr. (sic) Welsh thought he had referred Mr. Capello to see a Urologist based upon his handwritten notes ("Requested on 6/26/12") on his copy of Mr. Capello's September 23rd letter, but this is not the case.  (*Decl. of Knoll*, ¶ 44).  The only referral Dr. (sic) Welsh made concerning Mr. Capello on June 26, 2012 was to Gastroenterlogy for the purpose of Hepatitis C treatment.

Mr. Capello's next prostate examination occurred with Dr. (sic) Galina Dixon (Defendant) on March 12, 2013. Her examination revealed the same results as before: enlarged prostate without nodules. However, unlike Dr. (sic) Welsh, she prescribed Terazosin 1 mg to be used for two months and ordered a PSA test. Also, she made a referral to a urologist on behalf of Mr. Capello. (*Decl. of Knoll*, ¶45-47). On April 30, 2013, Mr. Capello again saw Dr. (sic) Dixon about his prostate problem. He reported urinating every two hours at night. Dr. (sic) Dixon increased his Terazosin to 2 mg and advised him that his PSA taken last month was within normal limits. [footnote omitted] (*Decl. of Knoll*, ¶49). On May 15, 2013, Mr. Capello submitted another specimen for Dr. (sic) Dixon so that his PSA could be checked. (*Decl. of Knoll*, ¶50). This PSA test came back within the normal range. During another May 21, 2013 appointment with Dr. (sic) Dixon,

1  Mr. Capello still complained about frequent urination at night, but stated it had improved from four urinations a night to just two to three. Dr. (sic)

2  Dixon informed him that the increased dose of Terazosin may take four to six weeks to begin working. (*Decl. of Knoll*, ¶51). A follow-up visit occurred regarding the

3  prostate treatment on June 12, 2013. At this appointment, Mr. Capello agreed to increase his dosage of Terazosin to 5 mg from the previous 2 mg. Also, Dr. (sic)

4  Dixon discussed with Mr. Capello the Urology consult she requested on March 12, 2013 and scheduled him for a follow-up appointment on July 9, 2013. (*Decl.*

5  *of Knoll*, ¶52). On July 9, 2013, Mr. Capello reported that his urination at night has slowed to two a night, but that he still goes to the bathroom a lot during the

6  day. He was again informed that his new dosage of Terazosin may take four to six weeks to make a difference in urination frequency. On November 4, 2013, Dr.

7  (sic) Dixon requested a medical consult for Mr. Capello to see a urologist for his enlarged prostate. (*Decl. of Knoll*, ¶53). Mr. Capello's next saw Dr. (sic) Dixon

8  on November 13, 2013. At this appointment Mr. Capello reported that he still urinates two times a night, but that he did not want to change his treatment

9  because of the ongoing Hepatitis C treatment. (*Decl. of Knoll*, ¶54). On November 25, 2013, Dr. (sic) Dixon performed her second digital exam on Mr.

10  Capello. This time she noted in Mr. Capello's medical record that the prostate had become more firm as compared to her first examination. (*Decl. of Knoll*, ¶55). On

11  December 3, 2013, Mr. Capello was seen by Dr. John B. Bak, Urologist, pursuant to Dr. (sic) Dixon's medical consult of November 4, 2013. (*Decl. of Knoll*, ¶53).

12  Dr. Bak's consult does not identify any concern for the prostate such as cancer, but rather diagnosed Mr. Capello with an overactive bladder (OAB). He

13  recommended switching Mr. Capello to a non-diuretic and also starting him on Ditropan 5 mg p.o. t.i.d. for his overactive bladder symptoms. (*Decl. of Knoll*,

14  ¶57).

15  (Dkt. 76 pp. 3-9).

16  Defendants summarized their arguments regarding plaintiff's claims in five brief

17  statements:

18  First, Mr. Capello's Hepatitis C has responded well to drug therapy and is now in remission. Second, the Meniere's disease has run its course and Mr. Capello's Ear

19  Nose and Throat (ENT) specialist believes it is well managed. Third, Mr. Capello's frequent urination episodes are a result of an over active bladder (OAB)

20  and not his enlarged prostate. Fourth, medical records confirm that Mr. Capello has received a 2000 mg low sodium diet since 2005. Fifth, the hearing aid

21  requested was not deemed to be medically necessary by the SCC, and Mr. Capello was not prevented from purchasing one with his own funds.

22  (Dkt. 75, p. 2). Defendants raise eight arguments in their motion for summary judgment:

23

24

1       1. Does the statute of limitations bar Mr. Capello's claims regarding a low sodium diet and hearing aid?

2       2. Was Mr. Capello wrongfully denied a hearing aid?

        3. Did Mr. Capello receive the requested 2000 mg low sodium diet?

3       4. Are State Defendants, Kelly Cunningham and Henry Richards and William Bailey entitled to qualified immunity?

4       5. Are State Defendant healthcare providers, Dr. Sziebert and Dr. (sic) Griffith, entitled to qualified immunity because they did not deprive Mr. Capello of his

5       Constitutional rights?

        6. Is Mr. Capello's claim regarding adequate treatment for Hepatitis C moot due

6       to the disease being in remission?

        7. Was Mr. Capello consistently and appropriately treated for his Meniere's

7       disease?

        8. Is Mr. Capello's concern about his enlarged prostate now moot with the recent

8       diagnosis of an over active bladder?

9  (Dkt. 75, pp 13-14).  Plaintiff responded and argues that the statute of limitations is tolled by

10  operation of a state tolling statute, RCW 4.16.350 (Dkt. 87, pp. 4-6).  Plaintiff then addresses the

11  remaining claims assuming that the three year statute of limitation does not apply (Dkt. 87-99).

12  Plaintiff also argues that defendants have intentionally concealed medical records.  The records

13  that plaintiff states are missing are from 2002 to 2005 (Dkt. 87, p. 6).  Plaintiff also states that the

14  food records of the Special Commitment Center have fraudulently concealed the actual amount

15  of sodium in the diets provided (Dkt. 87, p. 7).  However, the record the parties has placed before

16  the Court shows that as early as 2005 plaintiff stated he was unable to comply with the low

17  sodium diet because of "prison."  (Dkt. 76, Declaration of Knoll, Exhibit AA).  Again in 2006

18  plaintiff complained to Dr. Souliere that he was unable to maintain a 2000 mg sodium diet (Dkt.

19  76, Declaration of Knoll, Exhibit BB). Thus, the record reflects that plaintiff has been aware of a

20  problem with the sodium level in the facilities diet for a number of years.  Plaintiff provides

21  ample evidence to show that the menu is inaccurate, in the form of affidavits from persons who

22  work in the kitchen, menus, manufactures' food labels listing the amount of sodium in certain

23  items, and charts comparing the sodium amount listed on the menu with the amount plaintiff

24

1    alleges that the food contains (Dkt. 89 and 90, Exhibits 6, 7, 253, and 254).  However, plaintiff

2    states that he has self regulated his sodium intake since 2005 (Dkt. 76-2 Exhibit VVV).

3          Defendants submitted evidence showing that a Utilization Review Committee denied

4    plaintiff's request for a hearing aid in 2008 because plaintiff can hear out of his left ear and in the

5    committee's opinion the equipment was not medically necessary (Dkt. 80, ¶ 15).

6                                        STANDARD OF REVIEW

7          In federal court, summary judgment is required pursuant to Fed. R. Civ. P. 56(a) if the

8    evidence, viewed in the light most favorable to the nonmoving party, shows that there is no

9    genuine issue as to any material fact.  *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th

10   Cir. 1997).  The moving party bears the initial burden of establishing the absence of a genuine

11   issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  That burden may

12   be met by "'showing'-- that is, pointing out to the district court -- that there is an absence of

13   evidence to support the nonmoving party's case." *Id.* at 325.  Once the moving party has met its

14   initial burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and identify

15   facts that show a genuine issue for trial.  *Id.* at 323-24; *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

16   242, 248 (1986)(addressing this claim under the 1986 wording of Fed.  R. Civ. P. 56(e)).

17         Plaintiff confuses the summary judgment standard of review with the standard for

18   motions to dismiss in his response (Dkt. 87, pp. 3-4).  At the summary judgment stage the Court

19   dismisses an action if the non moving party has failed to come forward with admissible evidence

20   to refute the moving party's contentions.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

21   Contrary to plaintiff's contentions, leave to amend the complaint is not mandated (Dkt. 87, pp. 3-

22   4).

23

24

1       There are two components to plaintiff's Fourteenth Amendment due process claims.

2  First, plaintiff must show that the deprivation alleged is, objectively, "sufficiently serious."

3  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, the state official must have a

4  "'sufficiently culpable state of mind' … [T]hat state of mind is one of 'deliberate indifference' to

5  inmate health or safety." *Id*. (citations omitted). The state official will be liable only if "the

6  official knows of and disregards an excessive risk to inmate health and safety; the official must

7  both be aware of facts from which the inference could be drawn that a substantial risk of serious

8  harm exists, and he must also draw the inference." *Id*. at 837.

9       Plaintiff attempts to alter the standard for reviewing a Fourteenth Amendment medical

10  claim by arguing that state law sets forth a different standard of care (Dkt. 87, p. 2 citing RCW

11  71. 09.080 and WAC 388-880-010(2)).  Plaintiff also argues that his claim is the equivalent of a

12  state medical malpractice claim raised pursuant to RCW 7.70.040 (Dkt. 87, pp. 7-8).  Mere

13  negligence is not enough to support a claim that defendants are deliberately indifferent; instead,

14  plaintiff must show that defendants have purposefully ignored or failed to respond to his pain or

15  medical need in order to establish deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104

16  (1976).  Negligence in diagnosing or treating a medical condition, without more, does not violate

17  a plaintiff's constitutional rights. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

18  <u>DISCUSSION</u>

19       1.     Statute of limitations in plaintiff's low sodium diet and hearing aids claims.

20       The appropriate statute of limitations for a § 1983 claim is the forum state's statute of

21  limitations for tort actions.  *Wilson v. Garcia*, 471 U.S. 261, 269 (1985).  Washington State

22  provides a three-year statute of limitations for tort claims.  RCW § 4.16.080(2).  Accordingly, the

23  statute of limitations applicable to plaintiff's 42 U.S.C. § 1983 claim is three years.  *See  Joshua*

24

1   *v. Newell*, 871 F.2d 884, 886 (9th Cir. 1989).  The Court borrows the state's tolling provisions,

2   but federal law determines when a cause of action accrues.  *Bagley v. CMC Real Estate Corp.*,

3   923 F.2d 758, 760-62 (9th Cir. 1991), (*citing Norco Constr., Inc. v. King County*, 801 F.2d 1143,

4   1145 (9th Cir. 1986)).  A federal claim accrues when plaintiff knows or has reason to know of

5   the injury that is the basis of the action.  *Id.*

6          Plaintiff alleges that the statute of limitation is tolled in this case by acts of fraud.

7   Plaintiff claims that missing medical records and the inaccuracies in the sodium levels on the

8   menu are proof of fraud (Dkt. 87. pp. 4-6).  Plaintiff argues that under state law an act of fraud

9   tolls the running of the statute of limitation indefinitely (*id.*).  Plaintiff cites *Duke v. Boyd*, 133

10  Wn 2d, 80, 942 P.2d 351 (1997) as support for his contention.

11         The Washington Supreme Court's decision in *Duke* is based on the wording of the RCW

12  4.16.350 that was in effect in 1997 and the decision is based on statutory construction.  The

13  Court paraphrases the wording of the 1996-97 version of the statute:

14             Any civil action for damages for injury occurring as a result of health
               care…shall be commenced within three years of the act or omission alleged to
15             have caused the injury…or one year from discovery which ever time is later
               except that any action must be commenced within eight years.

16             PROVIDED, that the time for commencement is tolled upon proof of
               fraud, or intentional concealment…

17
    *See* 1996 RCW 4.16.350. Within one year of the *Duke* decision the Washington State legislature
18
    amended RCW 4.16.350 to limit the tolling provision.  The Court paraphrases the 1998 version
19
    of the statute as:
20
21             Any civil action for damages for injury occurring as a result of health
               care…shall be commenced within three years of the act or omission alleged to
22             have caused the injury…or one year from discovery which ever time is later
               except that any action must be commenced within eight years.

23             PROVIDED, that the time for commencement is tolled upon proof of
               fraud, or intentional concealment, until the date the patient or their representative

24

has actual knowledge of the fraud or concealment.  The person has one year from the date of actual knowledge to commence the action.

*See* 1998 RCW 4.16.350.  Thus, plaintiff's argument regarding tolling the running of the statute of limitation is based on outdated wording of the statute.

A.      Low sodium diet.

Plaintiff alleges that defendants fraudulently concealed the amount of salt in his diet, but the record that defendants place before the Court show that plaintiff began making this allegation in 2005 and 2006 (Dkt. 76, Exhibits AA and BB).  Plaintiff even states that he self regulates his diet and has done so since 2005 (Dkt. 76-2 Exhibit VVV).  The evidence shows that plaintiff was aware that the menu allegedly was not accurate and he self regulated his salt intake as early as 2005.   Thus, because he had actual knowledge of the alleged fraud in 2005, any tolling would have expired sometime in 2006 and the three-year statute of limitations would have expired by the time plaintiff filed this action on April 10, 2013. (Dkt. 1).

Therefore, plaintiff cannot obtain damages for defendants allegedly not providing a low sodium diet before April 10, 2010.  Plaintiff may proceed with his claim that he has been denied a low sodium diet from April 10, 2010 until the present.  The record the parties have placed before the Court shows that defendants Griffith, Welsh, and Dixon ordered low sodium diets for plaintiff within the last three years (Dkt 76-1 Exhibit EEE).  Plaintiff presents no evidence showing that any person other than defendant Temposky had actual control over the diet or menu.

Plaintiff has presented sufficient evidence to call into question the accuracy of defendant Temposky's claim that the diet plaintiff received was in fact a low sodium diet.  Plaintiff's evidence includes affidavits from kitchen workers who set forth the recipes for certain items, the daily menus, a chart outlining alleged discrepancies between the manufacturer's food labels

1  showings the amount of sodium in certain food items and the facilities menus, listing a lower

2  amount of sodium (Dkt. 89-90 Exhibits 6, 7, and 253-55).

3       At summary judgment the Court does not weigh the evidence. Plaintiff has shown that

4  there is a genuine issue of material fact regarding the accuracy of defendant Temposky's

5  contentions regarding the amount of sodium in plaintiff's diet.  Therefore, the Court recommends

6  denying defendant Tomposky's motion for summary judgment on this issue for plaintiff's claim

7  during the period of April 10, 2010 to the present.

8       Defendants other than Temposky cannot be held liable under 42 U.S.C. § 1983 solely on

9  the basis of a supervisory responsibility or position.  *Monell v. New York City Dept. of Social*

10  *Services*, 436 U.S. 658, 694 n.58 (1978).  Thus, the theory of *respondeat superior* is not

11  sufficient to state a claim under § 1983.  *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir. 1982).

12       Plaintiff has failed to show that any defendant except Mr. Temposky played a role in

13  determining the menu or reporting the amount of sodium in the daily diet.  Rather, the

14  undisputed record shows that plaintiff's health care providers requested that plaintiff receive a

15  low sodium diet (Dkt. 76-1, Exhibit EEE, Dkt. 81, ¶ 6-8) Therefore, plaintiff has failed to show

16  that any of the remaining defendants actually participated in allegedly failing to provide his a

17  low sodium diet during the relevant period.  Therefore, he Court recommends granting the

18  motion for summary judgment on the issue of a low sodium diet to all defendants except

19  defendant Temposky during the time frame from April 10, 2010 to the present.

20       B.     Hearing aids.

21       The undisputed facts are that audiologists recommended amplification for plaintiff's right

22  ear in July of 2005 and May of 2008 (Dkt. 76, Exhibits JJJ and KKK).  Plaintiff requested a

23  hearing aid in 2008 and the Special Commitment Center's Utilization Review Committee denied

24

1    the request because plaintiff's left ear tested normal and the committee determined that the

2    equipment was not "medically necessary." (Dkt. 76, Exhibit LLL and Dkt. 80 Affidavit of

3    Griffith, ¶ 15).  All of the facts giving rise to plaintiff's claim regarding his hearing aid arose

4    more than three years before plaintiff filed this action and, therefore, this claim is time barred.

5    There is no alleged fraud that would extend tolling the statute of limitations.  Therefore, the

6    undersigned recommends granting defendants' motion for summary judgment on this issue.

7           In the alternative defendants argue that plaintiff has no constitutional right to a hearing

8    aid under the facts of this case (Dkt 75, pp. 16-17).  A difference of opinion between a prisoner

9    and medical authorities regarding proper medical treatment does not give rise to a 42 U.S.C.

10   §1983 claim.  *Franklin v. Oregon, State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981).

11   Therefore, even if the Court concludes that the claim is not time barred, this Court recommends

12   denying plaintiff's claim regarding his hearing aid on the merits

13

14          2.       Qualified immunity for defendants Richards, Cunningham, and Bailey.

15          Defendants argue that these three defendants are entitled to qualified immunity from suit

16   (Dkt. 75, pp. 19-21).  Defendant Richards was the superintendent of the Special Commitment

17   Center from September of 2004 until May of 2009 (Dkt. 79).  Defendant Cunningham is the

18   current superintendent of the Special Commitment Center (Dkt. 78).  Defendant Bailey has been

19   a resident advocate at the Special Commitment Center since 2001 (Dkt. 82).

20          A public official performing a discretionary function enjoys qualified immunity in a civil

21   action for damages, provided his conduct does not violate clearly established federal statutory or

22   constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457

23   U.S. 800, 818 (1982) (citations omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 638

24

1   (1987) ("whether an official protected by qualified immunity may be held personally liable for

2   an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of

3   the action assessed in light of the legal rules that were 'clearly established' at the time it was

4   taken") (*quoting Harlow*, 457 U.S. at 818, 819); *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir.

5   2002).

6        Plaintiff begins his argument in response to the assertion of qualified immunity by stating

7   that defendants raised the defense in their official capacity and the defense does not protect them

8   in that capacity (Dkt.87. p. 15).  Plaintiff is incorrect.  Defendants raised the defense as public

9   officials named as defendants, personally, not as state officials in their official capacity (Dkt. 75,

10  p. 18).

11       Plaintiff next argues that because he is a civilly committed person he must be given

12  "'more considerate treatment and conditions of confinement than criminals, whose conditions of

13  confinement are designed to punish'" (Dkt. 87, p. 17, *citing Youngberg v. Romeo*, 457 U.S. 307,

14  322 (1982) and *Sharp v. Weston*, 233 F.3d 1166, 1172(9th Cir. 2000)).  Because plaintiff is not an

15  inmate his medical claims are reviewed under the Fourteenth Amendment due process clause

16  rather than under the Eighth Amendment cruel and unusual punishment clause.  However, the

17  Ninth Circuit has stated that the same analysis applies under either clause.  *Frost v. Agnos*, 152

18  F.3d 1124, 1128 (9th Cir 1998).  Therefore, the Court concludes that a Fourteenth Amendment

19  analysis is proper.

20       There are two components to plaintiff's claims that he did not receive adequate medical

21  treatment for his conditions. First, plaintiff must show that the deprivation alleged is, objectively

22  "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, the state official

23  must have a "'sufficiently culpable state of mind' … [T]hat state of mind is one of 'deliberate

24

1  indifference' to inmate health or safety." *Id.* (citations omitted). The state official will be liable

2  only if "the official knows of and disregards an excessive risk to inmate health and safety; the

3  official must both be aware of facts from which the inference could be drawn that a substantial

4  risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

5        Utilizing the Fourteenth Amendment standard plaintiff argues that:

6        .  .  .  Defendants' claims of providing adequate medical treatment to plaintiff is
         highly question [sic] and a misrepresentation to this court, when confronted with
7        overwhelming document records, sworn declaration and sworn testimony by not
         only Defendant Howard Welsh, but by Dr. Souliere and Dr. Mulhall also. As
8        clearly indicated by Defendant Welsh within a sworn declaration, that at his
         deposition he specifically testified under oath concerning the lack of medical
9        treatment that Mr. Capello (plaintiff) and other SCC residents have had to endure,
         while under the care of the Washington State Special Commitment Center Health
10       Care Clinic.  He also informed this court that the defendants have deliberately
         with held (sic) his direct testimony and facts from being held [sic] by this court.
11       Defendant Welch directly testified to the [court] that he personal [sic] notified
         Defendants William Bailey, via e-mail and through face-to-face conversation with
12       him directly concerning the on going problem of resident's medical appointments
         being delayed and canceled because they were not being escorted off the island to
13       see their medical specialists.  Pltf. Exhibits #2, paragraph 6, 10, and 11; Pltf.
         Exhibits # 424, 425, and 426; Also see: Court Dkt #27 [May 2013 Declaration of
14       Howard Welsh].

15  (Dkt. 87 pp. 19-20).

16       The Court has examined the exhibits specifically cited by plaintiff. In Exhibit 2,

17  paragraphs 6, 10, and 11 defendant Welsh makes broad conclusory statements that do not

18  implicate any of the named defendants except defendant Bailey. Defendant Welsh says he

19  contacted defendant Bailey both by e-mail and in face-to-face conversations regarding residents

20  not going off the island for scheduled medical visits.  Defendant Bailey specifically addressed

21  this issue in his affidavit and stated that Mr. Capello never approached him on this issue and as

22  the resident advocate it was not his roll to advocate for changes in SCC policy (Dkt. 82, p. 2 ¶ 7,

23  8 and 9).  Plaintiff has come forward with no admissible evidence to contradict defendant

24

REPORT AND RECOMMENDATION - 16

1    Bailey's assertion of fact.  The inquiry into causation must be individualized and focus on the

2    duties and responsibilities of each individual defendant whose acts and omissions are alleged to

3    have caused a constitutional violation.  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

4           Further, none of the parties have cited the Court to specific evidence showing that any of

5    plaintiff's scheduled medical trips were delayed or canceled.  To the extent that this evidence

6    may exist in the hundreds of pages of affidavits and information plaintiff has provided it has not

7    been brought to the Court's attention. A party may not prevail in opposing a motion for summary

8    judgment by simply overwhelming the district court with a miscellany of unorganized

9    documentation.  *See Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).

10          Plaintiff's Exhibit 424 is an unsworn statement allegedly made by defendant Welsh.  In

11   the statement, defendant Welsh does not implicate any named defendant and again makes only

12   conclusory allegations stating his opinion regarding the adequacy of the health care system at the

13   Special Commitment Center.  Not only is this exhibit an unsworn statement that cannot be used

14   as evidence in a summary judgment proceeding, but also the statement is conclusory and

15   nonspecific, which is not sufficient; the court will not presume "missing facts."  *Lujan v.*

16   *National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

17          Plaintiff's Exhibit 425 is a letter allegedly from defendant Welsh.  Defendants have not

18   objected to this exhibit.  Defendant Welsh states that in 2011 he told Dr. Szeibert that there were

19   residents who had not been properly treated for Hepatitis C.  Defendant Welsh states that he was

20   able to obtain treatment for two residents.  Defendant Welsh states that by June of 2012 he

21   concluded that plaintiff would benefit from treatment. The record shows that treatment was

22   provided to plaintiff, although apparently not as quickly as plaintiff or defendant Welsh would

23   have liked (Dkt. 76, Declaration of Knolls ¶ 13 to 23 (citing to plaintiff's medical records

24

REPORT AND RECOMMENDATION - 17

1   regarding treatment of hepatitis C)).  Defendant Welsh's letter does not provide evidence that

2   any trip planned for plaintiff was cancelled or that any named defendant was ever deliberately

3   indifferent to plaintiff's medical condition. Broad allegations that he did not receive medical

4   treatment in a timely manner, not associated with the actions or inactions of any particular

5   defendant, are not sufficient to defeat a motion for summary judgment pursuant to Fed. R. Civ.

6   P. 56(c)

7           To defeat summary judgment, plaintiff must show that one or more defendants were

8   deliberately indifferent to his medical care.  *See Farmer v. Brennan*, 511 U.S. 825, 834-37

9   (1994). Plaintiff has failed to make such a showing here.

10          In summary, plaintiff fails to overcome defendants' affirmative defense of qualified

11  immunity in this action because he does not show that defendants violated clearly established

12  law. The Court recommends granting Richards, Cunningham, and Bailey's motion for summary

13  judgment on this ground.

14          3.      Qualified immunity for health care providers Griffith and Sziebert.

15          Defendants argue that ARNP Griffith and Dr. Sziebert are entitled to qualified immunity

16  because they did not deprive plaintiff of his constitutional rights (Dkt. 75, pp. 21- 23).  The Court

17  has set forth the standard for a qualified immunity defense. *See supra*, p. 14.

18          Plaintiff fails to show that defendant Griffith violated any duty he owed plaintiff.

19  Defendant Welsh notes that it was defendant Griffith who first noted plaintiff's hepatitis C

20  condition at the Special Commitment Center (Dkt. 76-2 Exhibit TTT). Defendant Welsh states

21  that he saw nothing wrong with defendant Griffith's treatment of either the Miniere's disease or

22  the periodic "labs" plaintiff underwent to monitor plaintiff's hepatitis C condition (Dkt. 76-2,

23  Exhibit  TTT).  Plaintiff fails to show that defendant Griffith was deliberately indifferent to

24

1   plaintiff's medical conditions.  The undersigned concludes that defendant Griffith would be

2   entitled to qualified immunity from suit.

3       Plaintiff's argument regarding defendant Sziebert also fails to defeat the assertion of

4   qualified immunity.  Plaintiff places before the Court an incident involving another resident

5   where Dr. Sziebert allegedly said he would not mind seeing that person "die of liver failure."

6   (Dkt. 88-3, Exhibit 2, p. 3 ¶ 8).  This statement does not involve plaintiff or his case.  The record

7   defendants place before the Court show ARNP Dixon requesting Dr. Sziebert to perform a

8   psychiatric evaluation of plaintiff to determine if plaintiff could be treated for hepatitis C.

9   Defendant Dixon submitted the request December 27, 2012 and the consultation occurred

10  January 7, 2013 (Dkt. 72, p. 3, ¶ 8). Dr. Sziebert approved plaintiff for treatment within 11 days

11  of the request for a consultation. This is not the only place in the record where defendant Sziebert

12  treated plaintiff.  Dr. Sziebert approved plaintiff for hepatitis C treatment in September of 2013

13  when he had obtained all needed clearances (Dkt. 77, p. 3, ¶12).

14      In his declaration, Dr. Sziebert states that plaintiff's hepatitis condition was monitored

15  (Dkt. 77, p. 3 ¶ 9) and that plaintiff never presented with any visible symptoms consistent with

16  Hepatitis C (*id.* at ¶10). Defendants began testing and determined that treatment was appropriate.

17  Defendants then provided that treatment. Plaintiff fails to show that defendant Sziebert violated

18  any clearly established law that would subject him to liability for plaintiff's medical treatment.

19  The undersigned recommends granting defendant Sziebert's motion to for summary judgment

20  based on qualified immunity.

21      4.    Treatment for Meniere's disease.

22      Plaintiff's was treated for Meniere's disease by medical experts who are not named

23  defendants in this action.  With the exception a low sodium diet, plaintiff has failed to show that

24

1   any named defendant was deliberately indifferent to this medical condition.  On the contrary, the

2   record shows that plaintiff was sent off island at least fifteen times between 2005 and 2013 for

3   treatment or consultations with medical experts for Meniere's. The record also shows that

4   plaintiff received all three levels of Meniere's disease treatment (Dkt. 76, Exhibits Y, (low

5   sodium and diuretics in the form of Dyazide), BB (steroid injections into the ear), and X,

6   (chemical labyrinthectomy)). Further, when Dr. Souliere diagnosed plaintiff as having developed

7   positional vertigo, defendants followed through with prescribed therapy (Dkt. 76-1. Exhibit LL).

8   Plaintiff has presented no admissible evidence to dispute any of these facts. Therefore, the

9   undersigned recommends granting summary judgment to all defendants except defendant

10   Temposky's on this issue.  As noted above, issues of fact remain regarding defendant Temposky.

11         5.     Prostate treatment.

12         Defendants move for summary judgment arguing that plaintiff received adequate care for

13   his enlarged prostate and that medical providers determined that his symptoms are not the result

14   of his prostate (Dkt. 75, p. 24).

15         None of the defendants who brought this motion for summary judgment played any part

16   in plaintiff's treatment for his prostate condition.  This condition was treated by defendants

17   Welsh, (Dkt. 76-1, Exhibit OO), and Dixon (Dkt. 76-1, Exhibits QQ through ZZ), who are not

18   parties to this motion.  The undersigned addressed defendant Dixon's treatment of plaintiff in a

19   separate report and recommendation that is currently pending before the Court.  [Defendant

20   Welsh is still a party to this action, but has not moved for summary judgment. The undersigned

21   recommends disregarding defendants' argument on this issue.

22         6.     Hepatitis C treatment.

23

24

1    Defendants argue that plaintiff's claim relating to his treatment for hepatitis C is moot

2    because he has been treated and the disease is now in remission (Dkt. 75, p. 23).  Defendants'

3    argument is one paragraph long and contains no legal authority defining the concept of mootness

4    (*id.*).

5    A claim becomes moot if a litigant can obtain no relief for his claim.  *Foster v. Carlson*,

6    347 F.3d 742, 745 (9th Cir. 2003).  The concept of mootness is closely associated with the

7    concept of standing and the concept of case and controversy (*id.*).  Mootness is a jurisdictional

8    issue (*id.*).

9    Plaintiff's claims for damages for the medical treatment he received are not rendered

10   moot by the fact that he was subsequently treated.  In an appropriate case, where plaintiff has

11   presented admissible evidence that one or more defendants was deliberate indifferent, damages

12   may still be available for damages caused by such defendant's actions or inactions.  Defendants'

13   mootness argument is, therefore, without merit. Nevertheless, because these defendants have

14   qualified immunity, (see pages 14-19 above), this Court still recommends summary judgment be

15   granted as to these defendants.

16                                          CONCLUSION

17   The undersigned recommends granting defendants' motion for summary judgment in part

18   and denying the motion in part.  The only claim that survives summary judgment is the

19   allegation that defendant Temposky did not provide a low sodium diet to plaintiff between April

20   10, 2010 and the present time. The undersigned recommends dismissal of defendants Sziebert,

21   Cunningham, Richards, Griffith, and Bailey.

22   Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

23   fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

24

1    6.  Failure to file objections will result in a waiver of those objections for purposes of de novo

2    review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C).  Accommodating the time limit

3    imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on May

4    30, 2014, as noted in the caption.

5         Dated this 9th day of May, 2014.

6

7                                            J. Richard Creatura
                                             United States Magistrate Judge
8